Filed 11/6/13  Hernandez v. Overhill Farms CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ISELA HERNANDEZ et al., | B243844 |
| Plaintiffs and Appellants, | (Los Angeles County |
| v. | Super. Ct. No. BC416954) |
| OVERHILL FARMS, INC., | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, David L. Minning, Judge.  Affirmed.

The Myers Law Group, David P. Myers, Ann Hendrix, Vanessa Godinez-Elisarraraz; Righetti Law Firm, Matthew Righetti, John Glugoski, and Michael Righetti for Plaintiffs and Appellants.

Rutan & Tucker, Mark J. Payne, and Brandon L. Sylvia for Defendant and Respondent.

# INTRODUCTION

Plaintiffs are former employees of Overhill Farms, Inc. (Overhill), a company that manufactures frozen food products for sale to distributors and wholesalers. Plaintiffs asserted wage and hour claims against Overhill on behalf of a purported class made up of Overhill's nonexempt (hourly) employees who worked in identified departments between July 1, 2005, and the present.

The trial court denied plaintiffs' motion for class certification, concluding that the named plaintiffs were not adequate class representatives and individual issues predominated over common ones. Plaintiffs appeal, contending that the trial court applied incorrect legal standards and substantial evidence did not support its conclusions.

Our review of a denial of a motion for class certification is limited—we must affirm an order supported by substantial evidence unless the trial court used improper criteria or made erroneous legal assumptions. Further, we defer to the trial court's credibility determinations. Because we find that, in light of the trial court's credibility determinations, substantial evidence supported the trial court's conclusion that individual issues predominated over common ones, we affirm.

# PROCEDURAL BACKGROUND

## I. Complaint

On July 1, 2009, Bohemia Agustiana, Isela Hernandez, and Ana Munoz filed the present class action complaint against Overhill. The complaint alleged various labor law violations on behalf of plaintiffs and a class of persons employed by Overhill as hourly workers.

On October 31, 2011, Agustiana was dismissed from the action. Plaintiffs sought leave to add new named plaintiffs, and on November 28, 2011, they substituted Guadalupe Baez, Anastacio Mendez Trinidad, Zulema Sanchez, and Maria Gonzalez in place of Bohemia Augustiana and Ana Munoz.

Plaintiffs filed the operative second amended class action complaint on December 21, 2011. It alleged that plaintiffs and other members of the proposed class were current and former employees employed in hourly positions at Overhill in the following areas: production, assembly, shipping/receiving, packing, sanitation, quality control and cooking. Plaintiffs typically were scheduled to work eight hours each day. Defendant required plaintiffs to wear protective gear that included a hairnet, coat, and gloves, and to wash their hands for at least 20 seconds before starting work. Defendant required plaintiffs to don protective gear and wash their hands prior to the beginning of their shifts and after meal breaks, but it did not pay them for this time. Defendant also had a practice of rounding time worked at the beginning and end of each shift to its own advantage. Finally, during equipment breakdowns, which occurred regularly, plaintiffs were required to remain in the plant under defendant's control, but they were not paid for so-called "waiting time." The second amended complaint asserted four causes of action arising out of these common factual allegations: failure to pay minimum wage for all hours worked (first cause of action); failure to provide itemized wage statements, as required by Labor Code section 226[1] (second cause of action); waiting time penalties (§§ 201-203) (third cause of action); and unfair business practices (Bus. & Prof. Code, § 17200 et seq.) (fourth cause of action).

## II.    Motion for Class Certification

On March 21, 2012, plaintiffs moved to certify a class defined as follows:

"All non-exempt current and former employees of Overhill Farms in California, who work in the following areas: Production, Assembly, Shipping/Receiving, Packing, Sanitation, Quality Control and Cooking in the State of California at any time since July 1, 2005.

"All nonexempt former employees of Overhill Farms in California, who work in the following areas: Production, Assembly, Shipping/Receiving, Packing, Sanitation,

---

[1]      All further undesignated statutory references are to the Labor Code.

3

Quality Control and Cooking in the State of California at any time since July 1, 2005 to the present for waiting time penalties pursuant to Labor Code Section 203."

On April 18, 2012, the court stated that the class was ascertainable and numerous, class representatives Hernandez, Mendez, Sanchez, Baez, and Gonzalez were typical of the class, and proposed class counsel was qualified to conduct the proposed litigation. However, the court said that the proposed class representatives could not adequately represent the proposed class because some proposed class representatives were subject to agreements that required their employment disputes be resolved through binding arbitration, and none of the proposed class representatives demonstrated that they understood the obligations a class representative owes the class members. Further, the court said, none of the proposed class representatives was adequate because each provided Overhill with an invalid Social Security number when applying for his or her job. This casts strong doubts on their credibility and honesty. "The credibility of a named plaintiff is relevant to their adequacy as class representative. [Citation.] The fact that Named Plaintiffs used invalid [S]ocial [S]ecurity numbers when applying for their jobs, and did not correct those numbers when provided the opportunity, does raise doubts about their credibility. Whether those doubts are significant enough to find Named Plaintiffs inadequate to represent the class, however, is a difficult question. In *Jaimez* [*v. Daiohs USA, Inc.* (2010) 181 Cal.App.4th 1286,] the proposed class representative was found inadequate because he: '[l]ied on his . . . employment application about his felony conviction and incarceration, he admitted his view that it is acceptable to lie in order to obtain or maintain employment, questions surrounded his purported falsification of time records and other documents (notably, manifests), and his declaration may be contradicted by his deposition testimony.' *Id.* at 1296. The falsification of [S]ocial [S]ecurity numbers in this case raises similar credibility issues as in *Jaimez*, especially since named Plaintiffs had the opportunity to correct the information and did not do so. Based on these credibility issues, named Plaintiffs are arguably not adequate to represent the class members. . . ." (Fn. and internal record references omitted.)

4

The court also questioned the predominance of common issues and continued the motion for further briefing "regarding substitute named Plaintiffs and whether common questions predominate."

Following supplemental briefing, the court denied the motion for class certification on August 6, 2012. With regard the adequacy of proposed class representatives, the court repeated the analysis of its April 18 tentative, and added as follows:

"Plaintiffs point to a number of cases in support of their contention that classes have been certified regardless of the named plaintiffs' immigration status. In *Ansoumana v. Gristede's Operating Corp.*, the district court ruled that the defendant's 'concerns regarding the immigration status of the various named Plaintiffs as bearing on their potential credibility and fitness as class representatives [were] without merit.' (SDNY 2001) 201 F.R.D. 81, 88. Those concerns are not discussed in the opinion, however, so it is difficult to analogize the facts of that case to this one. On the other hand, it does demonstrate that cases have been certified where the immigrant status of the named plaintiff was used to challenge their adequacy and credibility. In *Leyva v. Buley*, the district court found the defendant's allegations of 'improprieties and/or possible illegal activities' by the named plaintiff were 'not substantiated with documentation.' (ED Wash.) 125 F.R.D. 512, 516-517. This differs from this case, where the evidence of Plaintiffs' use of incorrect [S]ocial [S]ecurity numbers is credible and specific.

"These cases, therefore[,] do not provide sufficient authority to require the Court to ignore the facts in this case. The facts here are that Named Plaintiffs twice lied to their employer with respect to their [S]ocial [S]ecurity numbers. This is a serious charge against their credibility and raises serious doubts that they should stand in a position of fiduciary responsibility to the class members. Therefore, Hernandez, Mendez, Sanchez, Baez and Gonzalez are not adequate Class Representatives. However, they should be provided an opportunity to locate new class representatives if one of the class claims is suitable for certification."

5

For reasons discussed in detail below, the court also found that common questions did not predominate because each of the issues raised by the plaintiffs required individualized inquiries. Finally, the court concluded that the plaintiffs had not demonstrated that a class action was a superior means of resolving the litigation: "The parties' evidence demonstrates that this class does not meet certain requirements for certification, including adequacy of class representative and commonality. The lack of commonality for the claims raised on behalf of the class means the Court will have to conduct an individual inquiry into each class members' claim for unpaid wages and missed meal breaks. Consolidation of numerous individual inquiries into a single action is not desirable. Therefore, superiority is not satisfied."

The order denying class certification was entered August 6, 2012, and notice of entry was served August 13, 2012. Plaintiffs timely appealed.

## DISCUSSION

Plaintiffs contend that the trial court erred in concluding that individual questions predominated with regard to their claims that Overhill (1) required employees to perform unpaid pre- and post-shift work, including "donning and doffing" protective gear, (2) illegally rounded employees' shift times, (3) failed to pay employees during equipment breakdowns, and (4) limited employees meal breaks to 25 minutes, rather than the 30 minutes required by law. Plaintiffs further contend that the trial court committed reversible error when it (5) concluded that all named appellants were inadequate class representatives.

For the reasons that follow, we conclude that substantial evidence supported the trial court's conclusion that individual questions predominated over common ones with regard to each of the plaintiffs' four theories of recovery. Because the proposed class therefore is not subject to certification, we do not reach plaintiffs' contentions regarding the adequacy of proposed class representatives.

6

## I.     Applicable Legal Principles and Standard of Review

"'Code of Civil Procedure section 382 authorizes class actions "when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court . . . ." The party seeking certification has the burden of establishing the existence of both an ascertainable class and a well-defined community of interest among class members . . .' (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326 [*Sav-On*]) and 'substantial benefits from certification that render proceeding as a class superior to the alternatives.' (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021 . . . .)" (*Hendleman v. Los Altos Apartments, L.P.* (2013) 218 Cal.App.4th 1380, 1389-1390 (*Hendleman*).)  The "community of interest" requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class.  (*Sav-On*, *supra*, 34 Cal.4th at p. 326.)

"The certification question is 'essentially a procedural one that does not ask whether an action is legally or factually meritorious.'  (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 439-440 (*Linder*).)  A trial court ruling on a certification motion determines 'whether . . . the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.'  (*Collins v. Rocha* (1972) 7 Cal.3d 232, 238; *accord, Lockheed* [*Martin Corp. v. Superior Court* (2003)] 29 Cal.4th [1096,] 1104-1105.)"  (*Sav-On*, *supra*, 34 Cal.4th at p. 326.)

"As '"trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification."'  (*Sav-On Drug Stores, Inc. v. Superior Court*, *supra*, 34 Cal.4th at p. 326.)  Accordingly, 'in the absence of other error, a trial court ruling supported by substantial evidence generally will not be disturbed "unless (1) improper criteria were used [citation]; or (2) erroneous legal assumptions were made [citation]" [citation].  Under this standard, an order based upon improper criteria or incorrect assumptions calls for reversal

"'even though there may be substantial evidence to support the court's order.'" [Citations.] Accordingly, we must examine the trial court's reasons for denying class certification' (*Linder*[, *supra*,] 23 Cal.4th [at pp.] 435-436) and 'ignore any unexpressed grounds that might support denial.' (*Kaldenbach v. Mutual of Omaha Life Ins. Co.* (2009) 178 Cal.App.4th 830, 844.) 'We may not reverse, however, simply because *some* of the court's reasoning was faulty, so long as *any* of the stated reasons are sufficient to justify the order. [Citation.]' (*Ibid.*)" (*Hendleman*, *supra*, 218 Cal.App.4th at p. 1390.)

## II.     Unpaid Pre- and Post-shift Work ("Donning and Doffing" Claim)

It is undisputed that time spent "donning and doffing" protective gear is compensable. (*IBP, Inc. v. Alvarez* (2005) 546 U.S. 21, 30 ["[A]ctivities, such as the donning and doffing of specialized protective gear, that are 'performed either before or after the regular work shift, on or off the production line, are compensable under the portal-to-portal provisions of the Fair Labor Standards Act if those activities are an integral and indispensable part of the principal activities for which covered workmen are employed and are not specifically excluded by Section 4(a)(1).'"].) At issue here is whether the trial court erred in concluding that common claims did not predominate with regard to plaintiffs' allegation that Overhill required them to "don" and "doff" protective gear off-the-clock. For the reasons that follow, we conclude that the trial court did not err.

### A.     *Plaintiffs' Evidence*

Plaintiffs' declarations stated that Overhill employees were required to clock in five to seven minutes prior to the start of their shifts to perform work for which they were not compensated. Isela Hernandez's declaration is illustrative:

"2.     I worked for Overhill Farms from January 2000 until May, 2009. During my employment I first worked as a production worker, and my last position was in quality control.

"3.    I normally worked in Plant 1 during my employment, but I worked in Plant 2 a couple of times.  I was usually scheduled to start work at 4:30 p.m. and my end time varied, often ending at 2:00 or 3:00 a.m.  My pay was $10.65 per hour.  The requirements for clocking in and what to do immediately after clocking in were identical in both plants except in Plant 2, the time clock is [out]side the building and in Plant 1, the time clock is inside the building.

"4.    Overhill Farms required me to clock in 5 to 7 minutes before my shift started, and I was not allowed to clock in earlier than that.  I was verbally reprimanded if I clocked in later than 5 minutes before my scheduled shift start time.  I was disciplined if I clocked in later than my scheduled start time.

"5.    After I arrived at work, I was required to perform the following tasks:

"6.    I got a hairnet from outside the entrance and put it on, and fixed it in the bathroom at the mirror because I was required to have no hair sticking out.

"7.    I got a coat and put it on.

"8.    I went upstairs to the Quality Control room and filled out paper work.

"9.    The company required us to wash our hands for 20 seconds, which I did.

"10.    I put on gloves.

"11.    When I became a quality control worker, I worked closely with production workers.  There was no change to the routine that production workers were required to perform when they arrived for work from the routine I was required to perform as a production worker.

"12.    Overhill Farms required the production workers to punch in 5 to 7 minutes before their scheduled shift time, and they were not allowed to clock in earlier than that.  They were disciplined if they clocked in later than their scheduled shift start time and their time was docked 15 minutes.  For example, if their scheduled start time was 5:00 pm and they tried to clock in at 5:02, they would be docked 15 minutes of pay.

"13.    The production workers were required to perform the following tasks before their scheduled shift time:

9

"14.    They got hairnets from outside the entrance and if needed, they fixed it in the bathroom at the mirror because they were required to have no hair sticking out.

"15.    The company required them to wash their hands for 20 seconds, which they did.

"16.    They put on their coats.

"17.    They put on gloves, which were cloth if handling cold items."

Guadalupe Baez (production, 2000-2009), Maria Gonzalez (production, 1983-2007), Maria Zulema Sanchez (production, 1999-2009), Anastacio Mendez Trinidad (production, 2006-2007; sanitation, 2007-2009), Maria Magdalena (assembly, 2001-2007; assistant to lead worker, 2007-2009), Juana Vasquez (packaging, 2006-2009), and Maria Vasquez (production and assembly, 2002-2009) submitted similar declarations.

Plaintiffs also submitted portions of the transcript of the deposition of Yolanda Diaz, Overhill's vice president of human resources, who testified that employees were expected to be in their workrooms at the start of their shifts, and were expected to put on hairnets and earplugs and to wash their hands before arriving at their workrooms. They further introduced an Overhill memorandum, dated March 8, 2005, regarding "Punch In/Out Times." The memo stated: "Please be advised that according to Federal Regulation 29 CFR Sec. 785.48, since we calculate your pay every quarter hour, you may not punch in any earlier than 7 minutes before your scheduled starting time, or any later than 7 minutes after your scheduled hour to leave. For example, if you start at 6:00 a.m. you may punch in from 5:53 to 6:00. If you leave at 2:30 p.m. you may punch out from 2:30 to 2:37. Also please remember that company policy requires you to be at your work station at your starting time. Failure to follow these guidelines will result in disciplinary action, which could include dismissal."

Finally, plaintiffs submitted employee timecards, which demonstrated that many employees clocked in before the beginning of their shifts and clocked out after the end of their shifts.[2]

### B.     Overhill's Evidence

In opposition to class certification, Overhill introduced several declarations, as follows.

Yolanda Diaz declared that since at least July 1, 2005 (the beginning of the class period), Overhill "has not had any written or unwritten policy requiring that employees punch in or perform any work prior to their scheduled start time, and it has had no policy requiring them to perform any sort of preparatory activities before their scheduled start time.  To the contrary, the CBA [Collective Bargaining Agreement] throughout this time period has always required Overhill to allow employees to clock in at the scheduled starting time if they arrive for work on time.  Specifically, Section 'F' of Article XI of the CBA . . . provides, 'Employees who arrive for work on time will be allowed to clock in at the scheduled starting time and will be paid for all waiting time from the scheduled starting time until commencing work.'  The employees have been represented by Local 770 throughout this time period, and although employees have filed complaints and

---

[2]     Plaintiffs also submitted portions of transcripts of depositions of several Overhill employees, which appeared to undermine their "donning and doffing" claim.  These deposition excerpts said as follows:

Beatriz Martinez testified that she always clocked in precisely at the scheduled start of her shift.  Her six coworkers also clocked in precisely at the scheduled start of their shift.  To her knowledge, all of the other assembly workers did the same thing.

Teodoro Garcia testified that if his scheduled start time was 4:00 p.m., he always clocked in at exactly 4:00 p.m.—never before and never after.  His coworkers clocked in when he did.  His understanding was that the company wanted him to clock in exactly at the moment that his shift started.

Dolores Martinez testified that she had never heard of a practice by which employees were supposed to clock in approximately five minutes before their scheduled start of shift.  She said that she clocked in at exactly 6:30 a.m. for a 6:30 a.m. shift.

grievances about numerous other issues, neither the Union nor any employee has ever filed any grievance about Overhill's compliance with this provision of the CBA.

"10.    In addition, Section 'C' of Article XII of the 2005-2008 CBA explicitly provides for payment of work before the scheduled start time.  The provision was also in effect during the 2008-2011 CBA (Art XII (E)).  Employee punch details reflect early call in pay and the employees are well aware of this provision.  If they had been 'working' prior to their scheduled start time, they would have demanded (and received) early call in pay.

"11.    Plaintiffs have indicated that a March 8, 2005 memorandum is evidence of a general rounding policy at Overhill.  Prior to its production in this lawsuit by one of the named plaintiffs, I had never seen this memo before.  I am not aware of its ever having been distributed to employees, it is not posted anywhere that I know of, and it has not been distributed to any employees that I know of.  In any event, the memo, which pre-dates the class period in this case, specifically instructs employees that they can clock in at their scheduled start time.  The memo does not require early punch in, and it does not require any work prior to the scheduled start time.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"13.    Overhill has no policy requiring employees to perform any work off-the-clock.  Overhill also has no policy requiring employees to perform any work, including putting on any clothing or other equipment, prior to their scheduled starting time."

Jose Menendez, Overhill's quality control supervisor from 2005 to 2011, declared that he "considered someone 'on time' as long as they were clocked in at their scheduled start time.  I never required any [Quality Control (QC)] employee to report to work before their assigned start time, and I am not aware of any policy that would require that. . . .  [¶]  . . . Some QC employees would arrive before their start time, while others would arrive at work immediately before their start time.  Those that came to work earlier than necessary did so out of personal preference.  For example, some QC employees would ride the bus, and the bus schedule would have them dropped off earlier than their assigned start time.  Other employees would carpool together, which often resulted in

12

employees arriving early. If, for example, one technician was assigned an earlier start time than the others, the others would simply wait around in the break room for their scheduled start time. And, particularly at Plant 2 (which has fewer employee parking spots than Plant 1), some employees arrived early to work to make sure that they got good parking spots. Employees who arrived early would often sit outside and chat with a friend, or sit in the break room and have coffee. I never saw an employee arrive early for work and then begin working prior to their scheduled start time. The only exception to this is that, on rare occasions, I would ask for volunteers to switch to an earlier shift with an employee who called in sick, or who had car trouble. If anyone volunteered to switch shifts, they would clock in prior to beginning work, and would be paid for the time after they clocked in."

Julieta Perez declared: "In the past, we were free to clock in before the scheduled start time, but we were not expected to arrive or clock in until the scheduled start time, though I generally would clock in a few minutes before the scheduled start time. I did this simply because I was already at work because I take the bus, and preferred to get ready a few minutes early so that I could get a preferred assigned station on the packing line. The positions were assigned on a first come, first served basis, so if I was a few minutes early I was more likely to get the packing of food in boxes as opposed to having to work near the freezer. I also did not like to feel rushed and preferred to do these activities a few minutes earlier than necessary. Some employees were like me and liked to get to work a few minutes early, but other employees preferred to arrive right at the scheduled start time. It was a matter of personal preference."

Teodoro Garcia declared that he has worked for Overhill since 2008, either as a packer or on the line. He stated: "I always clock in at the exact time in order to start working. I was never asked or expected to perform any work prior to the scheduled start time for my assigned shift, and I never performed any work before clocking in. . . . [¶] . . . I always clock in [in] order to start working exactly at 2:30. The company does not expect me to clock in earlier. [¶] . . . [¶] . . . At the end of the shift, we stop the assembly line for about 2 or 3 minutes so that everyone can finish. Once the line

13

finishes, then we are done.  Then at the packing area, the day ends when the last product comes on the line and the person for the next shift arrives to replace us.  Once that person arrives then we go.  Then I take off my gloves and then my smock before clocking out." Dolores Martinez, Beatriz Martinez, and Nestora Cabada submitted similar declarations.

### C.    Trial Court's Findings

In its June 26, 2012 ruling denying class certification, the court said as follows with regard to plaintiffs' "donning and doffing" claim:

"The evidence that class members are required to be at their work station ready to work at the start of their shift is contradictory.  Plaintiffs point to a memorandum on punching in and punching out, issued on March 8, 2005, which states that employees are to be at their work station at the start of their shift.  It is unclear whether this memorandum was distributed classwide.  They also point to their declarations, as well as the declarations of three other class members who all state identically that they were required to clock in five to seven minutes before their shifts started.  Finally, they point to the deposition testimony of Ms. Diaz, who stated that the company expects the workers to be in their assigned workroom at the start of their shift.  Of this evidence, the Named Plaintiffs' and class members' declarations lack credibility insofar as the declarations are all identical and boilerplate in nature.  The declarations do not provide any specific details, such as who told the class members to clock in early or that they would be disciplined for clocking in late.

"Moreover, other class members testified that they clocked in exactly when their shift was scheduled to start.  Beatriz Martinez testified that her scheduled start time has been 7:30 am for the past two years and that she clocks in exactly at 7:30 am.  She also testified that after clocking in she puts on her protective gear, washes her hands, and then goes to her line.  She further testified that the other assembly line workers that punch in at the same time as her also clock in at exactly 7:30 am.  This has been the practice for the eight years she has worked for Defendant.  Class member Teodoro Garcia testified that he and the persons he work[s] with also clock in right at the start of their shift, and that

14

this was the company's policy. This is also confirmed by class member Dolores Martinez, who worked for Defendant as a lead person. Ms. Martinez specifically testified that she had never heard of a practice whereby the class members clock in before the start of their shift.

"In reply, Plaintiffs provide the deposition testimony of some class members who state that they were disciplined for clocking in at the scheduled start of their shift because that was considered 'late.' However, this does not bolster Plaintiffs' argument of commonality as it does not disprove the testimony of class members who clocked in exactly at their scheduled start time. The reply deposition testimony, therefore, highlights that different class members had different experiences when they clocked in at the start of their scheduled shift. Some class members were evidently disciplined while others were not. This weighs against a finding of a classwide policy requiring class members to clock in prior to their scheduled start time.

"Plaintiffs' other evidence that there was a classwide and uniform practice that class members were required to clock in five to seven minutes before the start of their shift in order to don protective gear and washing their hands is also not persuasive. The class members' declarations lack credibility, as noted above. While it appears that Defendant had an expectation that the class members would be at their assigned workroom at the start of their shift, Ms. Diaz's testimony does not indicate that this expectation was ever communicated or enforced as to all class members. Therefore, Plaintiffs have not provided substantial evidence of a uniform and classwide practice requiring class members to be at their place in the work line at the exact start of their scheduled shift or exactly 30 minutes after the start of their meal break." (Internal record references omitted.)

### D.    Analysis

Plaintiffs contend that the trial court erred in concluding that common issues did not predominate with regard to plaintiffs' "donning and doffing" claim. Although their contention is not entirely clear, plaintiffs appear to suggest that the evidence is

15

undisputed that many employees clocked in prior to the scheduled start of their shifts and performed work for which they were not compensated. Further, plaintiffs urge that the trial court improperly reached the merits of the case, which it was not permitted to do at the class certification stage.

We note as an initial matter that our inquiry on appeal is not whether plaintiffs' evidence may have been sufficient to support class certification, but rather whether the record contains substantial evidence supporting the trial court's conclusion that individual facts are more numerous and significant than common issues. (*Dailey v. Sears, Roebuck & Co.* (2013) 214 Cal.App.4th 974, 992 (*Dailey*).) Further, in considering the substantiality of the evidence, we must defer to the trial court's credibility determinations: "[I]f the parties' evidence is conflicting on the issue of whether common or individual questions predominate (as it often is and as it was here), the trial court is permitted to credit one party's evidence over the other's in determining whether the requirements for class certification have been met." (*Id*. at p. 991.)

In the present case, the trial court had before it plaintiffs' testimony that Overhill employees were required to clock in before the start of their shifts. Had the trial court accepted this evidence, class certification of the "donning and doffing" issue would have been proper. The court accorded little weight to these declarations, however, concluding they lacked credibility. This credibility determination was well within the trial court's broad discretion in reviewing a class certification motion. (See *Dailey*, *supra*, 214 Cal.App.4th at pp. 991-992; *Mora v. Big Lots Stores, Inc.* (2011) 194 Cal.App.4th 496, 508-509 (*Mora*).)

The trial court's conclusion that common questions did not predominate with regard to the "donning and doffing" issue was supported by the testimony of numerous hourly workers (Beatriz Martinez, Teodoro Garcia, Dolores Martinez, Julieta Perez, and Nestora Cabado) who said that they and their coworkers always clocked in precisely at the start of their shifts, or that they clocked in a few minutes early as a matter of personal preference. These workers also testified that they had never heard of a policy requiring them to clock in prior to the start of their shifts, and had never been asked or expected to

16

perform any work prior to the start of their shifts. The trial court's conclusion also was supported by the testimony of Overhill's vice president of human resources, who said Overhill never had a written or unwritten policy requiring workers to punch in or perform any work, including any preparatory activities, prior to their scheduled start times. To the contrary, Overhill's policy throughout the class period was that employees who arrived at or prior to their scheduled start times would be paid from their scheduled start times. Taken together, this testimony was substantial evidence in support of the trial court's conclusion there was no uniform, company-wide policy requiring all employees to clock in prior to their scheduled start times—and thus that while some employees may have been required to clock in early, individual questions concerning such requirements predominated over common questions.

Our conclusion in this regard is similar to that reached by the Court of Appeal in *Dailey*, *supra*, 214 Cal.App.4th 974. There, Dailey brought suit individually and on behalf of a proposed class of similarly situated individuals, alleging that he and other managers and assistant managers regularly spent more than half their time performing nonexempt work and worked more than 40 hours per week, for which they were paid no overtime. (*Id.* at p. 981.) In support of his motion for class certification, Dailey submitted the declarations of 21 proposed class members, all of whom said they spent 75 to 90 percent of their time performing nonexempt work. In opposition, Sears argued that the tasks of managers and assistant managers varied greatly from day to day and from store to store. (*Id.* at p. 984.)

The trial court denied the motion for class certification, finding that certification was inappropriate because individual facts and issues were more numerous and significant than common issues. (*Dailey*, *supra*, 214 Cal.App.4th at p. 985.) The Court of Appeal affirmed, explaining as follows:

"Critically, if the parties' evidence is conflicting on the issue of whether common or individual questions predominate (as it often is and as it was here), the trial court is permitted to credit one party's evidence over the other's in determining whether the requirements for class certification have been met—and doing so is not, contrary to

17

Dailey's apparent view, an improper evaluation of the merits of the case. (*Sav-On, supra,* 34 Cal.4th at pp. 328, 331; see *Mora*[, *supra,*] 194 Cal.App.4th [at pp.] 508-509 . . . [it is within trial court's discretion to credit defendant's evidence over plaintiff's].) For example, the Supreme Court in *Sav-On* concluded that the record in that case contained 'substantial, *if disputed,* evidence that deliberate misclassification was defendant's policy and practice. The record also contain[ed] substantial evidence that, owing in part to operational standardization . . . , classification based on job descriptions alone resulted in widespread de facto misclassification.' (*Sav-On,* at p. 329, italics added.) The court acknowledged that the defendant disputed the plaintiff's misclassification theories and presented its own evidence that those theories could not be proved on a classwide basis because how class members spent their time varied significantly from manager to manager. (*Id.* at p. 331.) '*But the trial court was within its discretion to credit plaintiffs' evidence on these points over defendant's . . . .*' (*Ibid.,* italics added.) The court emphasized that '[t]he trial court was not deciding—nor are we—the merits of plaintiffs' case.' (*Ibid.*) Rather, it was merely recognizing that plaintiffs had established they likely could prove with evidence common to the class that 'misclassification was the rule rather than the exception . . . .' (*Id.* at p. 330.)

"We see nothing inappropriate in the trial court's examination of the parties' substantially conflicting evidence of Sears's business policies and practices and the impact those policies and practices had on the proposed class members. Neither the court's order nor the class certification hearing transcript indicates the trial court improperly focused on the validity of Dailey's allegations, and Dailey identifies nothing in the record suggesting otherwise. We therefore infer the trial court, as in *Sav-On,* weighed the parties' conflicting evidence for the sole, entirely proper, purpose of determining whether the record sufficiently supported the existence of predominant common issues provable with classwide evidence, such that '"the maintenance of a class action would be advantageous to the judicial process and to the litigants."' (*Sav-On, supra,* 34 Cal.4th at p. 326.) In determining the record did not support class certification, the trial court appears to have credited Sears's evidence indicating that highly

individualized inquiries would dominate resolution of the key issues in this case. Under the foregoing authorities, it was acting within its discretion in doing so.

"  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . "

"Having established that the trial court was permitted, in its discretion, to credit Sears's evidence over Dailey's in finding a lack of commonality, we must now consider whether that evidence is substantial, and thus sufficient, to support the trial court's ruling. [Citation.] Dailey argues it is not. We disagree.

"Initially, we observe that in his briefs on appeal, Dailey seems to focus less on whether Sears's evidence is substantial than on whether his own evidence satisfies that standard. This misconstrues the function of this court. Our role on this appeal is narrowly confined to examining whether the trial court's ruling is supported by substantial evidence, and if it is, we may not substitute our own judgment for that of the trial court. [Citation.] To affirm the certification order, we 'need not conclude that [Sears's] evidence is compelling, or even that the trial court would have abused its discretion if it had credited [Dailey's] evidence instead.' [Citations.] '[I]t is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.' [Citation.] Accordingly, we do not ask on this appeal whether Dailey's evidence may have been sufficient to support class certification, but confine our analysis to whether the record contains substantial evidence supporting the trial court's conclusion that 'individual facts and issues . . . requiring separate adjudication are more numerous and significant than the common issues.'

"As noted, Dailey's principal theory of liability is that Sears implemented uniform policies and practices that resulted in the classwide misclassification of Managers and Assistant Managers as exempt employees. Sears presented substantial evidence, including the declarations and/or deposition testimony of 21 proposed class members and six corporate managers or other personnel, that the policies and practices identified by Dailey either do not exist, or if they do, they do not have the alleged uniform, illegal

19

effect of requiring Managers and Assistant Managers to engage primarily in nonexempt work.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . "

"Furthermore, Sears's evidence undermines the essential premise of Dailey's motion for class certification, namely, that Sears's liability could be established with common evidence because Sears's allegedly uniform business practices had the same impact on Managers and Assistant Managers classwide. Based on Sears's evidence, the trial court reasonably could infer not only that the proposed class members have flexibility in applying the allegedly 'uniform' policies and practices in their stores, but also that the day-to-day tasks of Managers and Assistant Managers, rather than being uniformly dictated by these few policies and practices, vary greatly depending on a number of factors, ranging from the store's location to particular management styles and preferences.

"Whether the trial court could have properly certified a class based on Dailey's conflicting evidence of centralized behavior on the part of Sears toward its auto center Managers and Assistant Managers, with the resulting classwide effect of misclassification, is not the inquiry before this court. In light of Sears's substantial evidence disputing the uniform application of its business policies and practices, and showing a wide variation in proposed class members' job duties, the trial court was acting within its discretion in finding that plaintiff's theory of Sears's liability was not susceptible of common proof at trial. [Citation.]" (*Dailey*, *supra*, 214 Cal.App.4th at pp. 991-997.)

For all of these reasons, we conclude that the trial court did not abuse its discretion in declining to certify a class with regard to plaintiffs' "donning and doffing" claim.


### III.  Overhill's Rounding Policy

The parties agree that rounding of an employee's time is permitted under California law if the rounding is a "'neutral calculation tool for providing full payment to employees.'" (Quoting *See's Candy Shops, Inc. v. Superior Court* (2012) 210

Cal.App.4th 889, 901-902 (*See's Candy*).) Plaintiffs allege that Overhill employed a rounding policy throughout the class period that was not neutral. Specifically, they assert that Overhill rounded employee time as follows:

● Employees were not permitted to clock in more than seven minutes before the start of their shifts.

● If employees clocked in one to seven minutes before the start of their shifts, their time was rounded forward to the start of shift.

● If employees clocked in after the start of shift, even by one minute, their time was rounded forward to 15 minutes after the start of shift.

● If employees clocked out one to seven minutes after the end of shift, their time was rounded backward to the end of shift.

● Employees were not permitted to clock out more than seven minutes after the end of shift.

The effect of this rounding policy, plaintiffs assert, was to deny them full payment of their wages because employee time was always rounded forward, never backward. Plaintiffs thus contend that Overhill's rounding policy violated state law; further, because the policy was uniformly enforced, it is appropriate for class treatment.

We begin by discussing *See's Candy*, *supra*, 210 Cal.App.4th 889, which plaintiffs and Overhill agree articulates the legal standard applicable to claims of rounding. We then discuss the evidence offered by the parties in support of and opposition to class certification, concluding that the trial court did not abuse its discretion in concluding that common issues did not predominate with respect to this claim.

A. *See's Candy*

In *See's Candy*, *supra,* 210 Cal.App.4th 889, the court considered the legality of two timekeeping policies employed by See's. (*Id.* at p. 892.) Under the "nearest-tenth" policy, in and out punches were rounded up or down to the nearest tenth of an hour, i.e., to the nearest three-minute mark. Thus, if an employee clocked in at 7:58 a.m., the system rounded forward to 8:00 a.m.; if the employee clocked in at 8:02 a.m., the system

21

rounded back to 8:00 a.m.  Under the "grace period" policy, employees were permitted to punch in up to 10 minutes before their scheduled start time and 10 minutes after their scheduled end time.  Under the company's rules, employees were not permitted to work during the grace period, but were expected to use the time for personal activities.  Because See's assumed the employees were not working during the 10-minute grace period, if an employee punched into the system during the grace period, the employee was paid based on his or her scheduled start/stop time, rather than the punch time.  (*Id.* at pp. 892-893.)

The trial court certified a class composed of all See's hourly employees.  (*See's Candy*, *supra*, 210 Cal.App.4th at p. 893.)  Plaintiff then moved for summary adjudication of See's affirmative defense that its timekeeping policies were consistent with state and federal laws.  The trial court granted summary adjudication for plaintiff, and See's filed a petition for writ of mandate.  (*Id.* at pp. 894-899.)

The Court of Appeal issued the writ.  It explained that although California employers have long engaged in employee time-rounding, there is no specific California statute or case law specifically authorizing or prohibiting the practice.  However, the California Department of Labor Standards Enforcement (DLSE), the state agency charged with enforcing California wage and hours laws, has adopted the following federal regulation:  "'It has been found that in some industries, particularly where time clocks are used, there has been the practice for many years of recording the employees' starting time and stopping time to the nearest 5 minutes, or to the nearest one-tenth or quarter of an hour.  Presumably, this arrangement averages out so that the employees are fully compensated for all the time they actually work.  *For enforcement purposes this practice of computing working time will be accepted, provided that it is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked.*'  (29 C.F.R. § 785.48(b) (2012), italics added.)"  (*See's Candy*, *supra*, 210 Cal.App.4th at p. 901.)

The court noted that although statements in the DLSE Manual are not binding on the courts, they may be considered for their persuasive value.  Further, in the absence of

22

controlling or conflicting California law, California courts generally look to federal regulations under the FLSA for guidance. Thus, it said, "[t]he policies underlying the federal regulation—recognizing that time-rounding is a practical method for calculating worktime and can be a neutral calculation tool for providing full payment to employees— apply equally to the employee-protective policies embodied in California labor law. Assuming a rounding-over-time policy is neutral, both facially and as applied, the practice is proper under California law because its net effect is to permit employers to efficiently calculate hours worked without imposing any burden on employees. (See *Gillings v. Time Warner Cable LLC* [(C.D.Cal., Mar. 26, 2012, No. CV 10-5565-AG(RNBx))] 2012 WL 1656937 at *5.)" (*Id.* at pp. 901-903.)

Having concluded that a rounding policy complies with California law if it is fair and neutral, the court then considered whether See's Candy's rounding policies complied with this standard. (*See's Candy*, *supra*, 210 Cal.App.4th at p. 907.) It concluded that the issue could not be resolved on the summary adjudication record before it. The court noted that it was undisputed that California law permitted a grace period ("the time during which an employee punches in before his or her compensable pay is triggered") *so long as* the employee was not working or was not otherwise under the employer's control during that period. (*Id.* at p. 909.) Accordingly, an employee's claim that he or she should have been paid during the grace period "raises factual questions involving whether the employee was in fact working and/or whether the employee was under the employer's control during the grace period." (*Ibid.*) Because the plaintiff had not produced any evidence showing that class members who clocked in during the grace period were working or were under the employer's control, the court held the summary adjudication motion should not have been granted. (*Id.* at pp. 910-914.)

With the principles articulated in *See's Candy* in mind, we turn now to the record and contentions of the parties in the present case.

23

### B. *Plaintiff's Evidence*

In support of class certification of the rounding issue, plaintiffs relied on the March 8, 2005 memorandum discussed above. (See p. 10, *ante*.) They also cited portions of the deposition of Yolanda Diaz, who testified that if employees clocked in early, the timekeeping system rounded forward to their scheduled start times. If employees clocked in late, the timekeeping system rounded forward to the next quarter hour. Thus, if an employee scheduled to start work at 7:00 a.m. clocked in at 6:45, the timekeeping system rounded forward to 7:00; if the same employee clocked in at 7:05, the timekeeping system rounded forward to 7:15. An employee who clocked in after his or her scheduled start of shift "could be sent to the . . . lunch room. They could be permitted to work. . . . It would depend on the production schedule, how late they were, how many employees we needed." An employee sent to the lunch room would be "free to do whatever they'd like to do."

Further, plaintiffs submitted employee declarations stating that Overhill employees were required to clock in five to seven minutes before the start of their shifts, during which time they performed work for which they were not compensated. They were not allowed to clock in more than seven minutes early. Plaintiffs also said that if they clocked in even one minute after the start of their shifts, their time was docked up to 15 minutes. For example, if their scheduled start time was 5:00 p.m. and they tried to clock in at 5:02, they would be docked 13 minutes of pay.

Plaintiffs' declarations said that at shift's end, they were told when to clock out, but "[s]ometimes I would not be allowed to clock out if the time clock was already past the halfway mark of the quarter hour (for example, 1:08 p.m.). Then I had to wait until the quarter hour (for example, 1:15 p.m.) to clock out. If the time clock was earlier than that (for example, 1:06 p.m.), then I could clock out. Other times, the human resources clerical worker would ask the lead worker what end time the production workers would be paid until on that day. On those days, we could clock out any time because the clerical worker would adjust the time to what the lead worker said."

## C.    *Overhill's Evidence*

In opposition to class certification, Overhill relied on the declaration of Yolanda Diaz; as relevant to the rounding issue, Diaz said:  "Throughout the employment of the named plaintiffs in this case, Overhill paid employees only from their scheduled start time, as required by the CBA; thus, it did not matter whether they clocked in 1 minute early or 10 minutes early, they would be paid only from their scheduled start time.  In addition, if they clocked in late, then Overhill imposed a penalty of up to 15 minutes.  The CBA states that employees will be paid from the scheduled start time."

Overhill also relied on the declarations of several Overhill employees.  Jose Menendez (quality control supervisor) said in his declaration that some employees chose to arrive at work and clock in prior to the scheduled start of their shifts, but those who did so "would often sit outside and chat with a friend, or sit in the break room and have coffee.  I never saw an employee arrive early for work and then begin working prior to their scheduled start time."  Julieta Perez, a packer, stated in her declaration that she used to arrive at work early because she took the bus, but she was never asked or expected to perform any work prior to the scheduled start of her shift and she never performed any work before clocking in.  Teodoro Garcia, Dolores Martinez, Beatriz Martinez, Julieta Perez, and Nestora Cabada all stated in declarations that they "never felt that a supervisor manipulated the timing of when I left to somehow take paid time away from me."

## D.    *The Trial Court's Findings*

The trial court held that the rounding allegation was not appropriate for class treatment because common issues did not predominate:

"[Plaintiffs allege that] Defendant uniformly rounds time for pre- and post-shift work always in its favor.  Plaintiffs contend this is unlawful under the DLSE Enforcement Manual, which states that rounding practices 'will be accepted by DLSE, provided that it is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked.' DLSE Enforcement Manual 2002 Update § 47.2.

25

"The evidence demonstrates that Defendant had a policy of rounding the class members' time. First, Defendant issued a 'punch in punch out' memo, which states class members were not to punch in or out more than seven minutes outside of their scheduled shift so that Defendant would always be able to round to the nearest hour. Second, Ms. Diaz testified that class members are only paid from the start of their shift, not before. This is evidenced by the time members' time records, which are rounded to exclude time that is outside their scheduled shifts.

"Defendant argued in opposition that the class members were not always working during the time that they clocked in before or clocked out after their scheduled shift, which raises individualized questions as to whether the rounding failed to compensate the employees for time actually worked. As this is an affirmative defense raised by Defendant, its impact on commonality must be examined. Although Plaintiffs contend in their supplemental briefing that liability turns solely on the record created by the clock in and clock out times, the original motion for certification belies this argument. In order to avoid the individualized questions raised by Defendant's affirmative defense, Plaintiffs spent significant time arguing that the class members are required to perform pre- and post- shift work (donning and doffing of protective gear, hygiene activities, etc.) and must be ready to work at the scheduled start of their shifts. Plaintiffs' current contentions, that their argument regarding the donning and doffing policy was irrelevant, is difficult to countenance. As noted earlier, Plaintiffs did not provide substantial evidence of a classwide policy to be 'ready to work' at the scheduled start of their shift such that they had to perform work prior to their shift." (Internal record references omitted.)

### E. Analysis

Plaintiffs assert that Overhill's rounding policy violates applicable law because it uniformly rounds in the employer's favor. The rounding policy is appropriate for class treatment, plaintiffs assert, because Overhill uniformly applied it to the entire proposed class. Further, they say, the trial court applied improper legal criteria when it "reached

26

into the merits of the issue as to what worker[s] did during their time pre and post shift that was rounded, rather than focusing on the actual issue for class certification, the question of whether or not [Overhill's] rounding policy is lawful or not lawful."

We do not agree with plaintiffs that the trial court applied improper legal criteria by considering whether employees who clocked in early or late were working during the pre- and post-shift periods for which they were not paid. Indeed, *See's Candy* mandates this inquiry. It held that if an employee clocks in prior to the start of his or her shift, such time is properly rounded forward to the start of shift "*if* the employee is not working or is not under the employer's control." (*See's Candy*, *supra*, 210 Cal.App.4th at p. 909.) Thus, the trial court could not evaluate the legality of Overhill's rounding policy without knowing whether employees were working or otherwise were under Overhill's control after they clocked in pre-shift.

Further, substantial evidence supported the trial court's conclusion that individual questions predominated with regard to Overhill's pre- and post-shift rounding policy. Although several of the named plaintiffs stated in their declarations that they performed work for which they were not compensated prior to their scheduled start of their shifts, other workers testified that while they sometimes clocked in before the start of their shifts, they did not begin working until the shift began. For example, Jose Menendez stated in his declaration that although some quality control workers clocked in before the start of their shifts, he never saw any worker begin working prior to the start of his or her scheduled time. Instead, they "would often sit outside and chat with a friend, or sit in the break room and have coffee." Yolanda Diaz gave similar testimony, stating that Overhill "has no policy requiring employees to perform any work, including putting on any clothing or other equipment, prior to their scheduled starting time." And Julieta Perez, a packer, stated in her declaration that although she sometimes arrived at work early because she took the bus, she was never asked or expected to perform any work prior to the scheduled start of her shift. Thus, Overhill's evidence "undermines the essential premise of [plaintiffs'] motion for class certification, namely, that [Overhill's] liability could be established with common evidence because [Overhill's] allegedly uniform

27

business practices had the same impact on [employees] classwide.  Based on [Overhill's] evidence, the trial court reasonably could infer . . . that the [legality of Overhill's rounding policies] vary greatly depending on a number of factors."  (*Dailey*, *supra*, 214 Cal.App.4th at pp. 996-997.)  In light of Overhill's substantial evidence disputing the uniform operation of its rounding policies, "the trial court was acting within its discretion in finding that plaintiff[s'] theory of [Overhill's] liability was not susceptible of common proof at trial."  (*Dailey*, *supra*, at p. 997.)

Plaintiffs contend that the March 8, 2005 memorandum confirms a policy "in which workers would never be allowed to clock in or out at a time that would be rounded to their benefit," but we do not agree.  The memo predates the class period, which commenced July 1, 2005.  Further, while the memo describes a policy by which time is rounded forward at the beginning of shift and backward at the end of a shift, it does *not*, as Overhill correctly points out, require that employees perform any pre- or post-shift work

Our analysis is similar with regard to Overhill's rounding-forward "penalty" for employees who clocked in after the start of their shifts.  It is undisputed that if an employee clocked in late, his or her time would be rounded forward to the next quarter hour—both plaintiffs and Overhill's "person most knowledgeable" testified to this consequence.  However, the only testimony as to how the late employee spent his or her rounded time is that of Yolanda Diaz, who said that late employees sometimes were sent to the lunch room, where they were "free to do whatever they'd like to do," and other times were permitted to work.  On this limited record, the trial court did not abuse its discretion in concluding that there was not a well-defined class of persons who performed unpaid work as a consequence of clocking in after the scheduled start of their shifts.

**IV.     Unpaid Time During Equipment Breakdowns**

*A.     Evidence*

Plaintiffs' third theory of recovery concerned equipment breakdowns.  According to plaintiffs, if equipment broke down during a shift, employees were required to stay on

company property but were not paid for up to one hour of waiting time each month. In support, plaintiffs submitted the declaration of Guadalupe Baez, in which she stated as follows: "If the equipment broke down while I was working as a Production Worker, Overhill Farms required me to stay on its property while it was repaired. I was not paid for up to one hour of work time each month during equipment breakdowns. . . . If the equipment broke down while I was working as a Lead Person, Overhill Farms required me to stay on its property while it was repaired but I was paid for the time." Maria Gonzalez (production), Maria Zulema Sanchez (production), Anastacio Mendez Trinidad (production),[3] Maria Magdalena (assembly), Juana Vasquez (packaging), and Maria Vasquez (production and assembly) gave similar declaration testimony, each stating that he or she was not paid for up to one hour of waiting time each month while broken equipment was repaired, but was not allowed to leave company property during this time.

In opposition to class certification, Overhill submitted the declaration of Yolanda Diaz, which stated in pertinent part as follows:

"14.   Pursuant to Section XI.I of the CBA between the Union and Overhill, '[i]f there is an equipment breakdown, the waiting time shall be without pay for an aggregate of not more than one (1) hour over a calendar month. If the aggregate waiting time is more than 1 hour, the employee shall be paid for the waiting time.' Nothing in the CBA suggests that employees must remain available to work during the unpaid portion of the 'waiting time,' or that their break time is in any way restricted.

"15.   If individual employees contend that they either performed actual work or remained subject to Overhill's control during an unpaid machine breakdown, then this would run counter to the standard practice.

"16.   The use of the limited machine breakdown time varied from department to department. Assembly workers sometimes received such breaks, but Quality Control, Sanitation, Cooking, and Shipping/Receiving did not receive unpaid breaks when machines broke down because they had other work to do."

---

[3]   Anastacio Mendez Trinidad also worked in sanitation; as a sanitation worker, he said he was paid during equipment breakdowns.

Overhill also submitted the declarations of several hourly workers, who stated as follows:

Jose Menendez (quality control supervisor): "I have been informed that under the Union contract, Overhill is permitted up to one hour of unpaid machine breakdown time each month. After that amount is used, employees are to be paid if and when the machines break down, unless they are dismissed from work. This was never an issue for [Quality Control (QC)] employees. QC employees can and do continue to perform their duties when the assembly line stops for a period of time due to equipment malfunction."

Teodoro Garcia (assembly line employee): "Occasionally, some machine on the assembly line will break down and stop the line from running. But the machines do not break very often. When that happens, I inform the supervisor and he sends the workers to work at another room. Usually, at the Boning Room. Usually I remain there to help get the line started. No employee has been told to wait and not get paid for this time."

Dolores Martinez (lead person in charge of assembly line): "Occasionally, some machine on the assembly line will break down and stop the line from running. But the machines do not break very often. When that happens, I send the workers to work at the Boning Room and they get paid for this time."

Beatriz Martinez (assembler): "Occasionally, some machine on the assembly line will break down and stop the line from running. But the machines do not break very often. When that happens, we are sent to work elsewhere. We always get paid for this time, unless it happens during our break."

Julieta Perez (packer): "Occasionally, some machine on the assembly line will break down and stop the line from running. But the machines do not break very often. In that case, the packets of food continue to come out to the packing area and I continue to work."

B. *Trial Court's Findings*

With regard to plaintiffs' claim regarding unpaid time during equipment breakdowns, the trial court found as follows: "Defendant admits the employees' CBA

30

has a policy with respect to what occurs when equipment breaks down. Specifically, the CBA states that 'if there is an equipment breakdown, the waiting time shall be without pay for an aggregate of not more than 1 hour over a calendar month. If the aggregate waiting time is more than 1 hour, the employee shall be paid for the waiting time.' Plaintiffs contend that this violates the employers' obligation to pay the class members for all hours worked. Defendants respond that this policy is lawful under IWC Wage Order 3, which states: [¶] 'If during any workday an employer declares a work recess of one-half (1/2) hour or more, other than a meal period, and the employer notifies the employees of the time to report back for work and permits them to leave the premises, such recess need not be treated as hours worked provided that there shall not be more than two (2) such recess periods within one shift and the total duration does not exceed two (2) hours. Work stoppages of less than one-half (1/2) hour may not be deducted from hours worked.' IWC Wage Order 3-2001 § 3(F).

"According to defendants, the law allows work stoppages of up to two hours so long as the employees are notified of the time to report back and are allowed to leave the premises. The pertinent questions that determine liability, therefore, are whether the class members are permitted to leave the premises and whether they were notified of a time to report back to work. The evidence Plaintiffs provide with respect to the work stoppages is the declarations of the class members. The declarants uniformly state that they were required to stay on Defendant's premises by unnamed actors if equipment broke down, but were not paid for that time. Again, the identical, boilerplate and vague nature of the declaration statements strongly detracts from their ability to persuade. Without substantial evidence of a classwide policy requiring the class members to stay on the premises, Plaintiffs do not demonstrate how the Court can determine whether Defendant is liable for the time spent waiting during equipment breakdowns. Therefore, individual questions will predominate this theory of recovery." (Internal record references omitted.)

31

### C. Analysis

Plaintiffs contend that the trial court applied the incorrect legal criteria to the equipment breakdown claim because it "reviewed the [equipment breakdown] policy and unilaterally decided at class certification that Wage Order 3 (not Wage Order 1) applied, and then granted 'summary judgment' by finding that Appellants failed to prove by substantial evidence that Overhill had a class wide policy requiring class members to stay on the premises in violation of Wage Order 3." Plaintiffs claim that by doing so, the trial court made two independent errors—it (1) decided a controverted legal question at the class certification stage, and (2) determined erroneously that individual issues predominated. For the reasons that follow, we reject both contentions.

Wage Order 3-2001 (Cal. Admin. Code, tit. 8, § 11030) applies to "all persons employed in the canning, freezing, and preserving industry," defined as "any industry, business, or establishment operated for the purpose of canning soups, or of cooking, canning, curing, freezing, pickling, salting, bottling, preserving, or otherwise processing any fruits or vegetables, seafood, meat, poultry or rabbit product, when the purpose of such processing is the preservation of the product and includes all operations incidental thereto." (Subds. 1, 2(B).) Wage Order 1-2001 (Cal. Admin. Code, tit. 8, § 11010) applies to "all persons employed in the manufacturing industry," defined as "any industry, business, or establishment operated for the purpose of preparing, producing, making, altering, repairing, finishing, processing, inspecting, handling, assembling, wrapping, bottling, or packaging goods, articles, or commodities, in whole or in part; EXCEPT when such activities are covered by Orders in the: Canning, Preserving, and Freezing Industry; Industries Handling Products After Harvest; Industries Preparing Agricultural Products for Market, on the Farm; or Motion Picture Industry." (Subds. 1, 2(H).)

Plaintiffs are correct that Wage Order 3-2001 provides that "If during any workday, an employer declares a work recess of one-half (1/2) hour or more, other than a meal period, and the employer notifies the employees of the time to report back for work and permits them to leave the premises, such recess need not be treated as hours worked

32

provided that there shall not be more than two (2) such recess periods within one shift and the total duration does not exceed two (2) hours.  Work stoppages of less than one-half (1/2) hour may not be deducted from hours worked." (Subd. 3(F).)  Wage Order 1-2001 does not contain an analogous provision.

Plaintiffs contend that the legality of Overhill's work stoppage policy turns on whether Wage Order 1-2001 or Wage Order 3-2001 applies to Overhill, and that question—which wage order applies to Overhill—is a common question that should have been certified for class action.  We do not agree.  Under both Wage Order 1-2001 and Wage Order 3-2001, "hours worked" means "the time during which an employee *is subject to the control of an employer*, and includes all the time the employee is suffered or permitted to work, whether or not required to do so." (§§ 11010, subd. 2(G), 11030, subd. 2(H), italics added.)  Thus, under *either* Wage Order 1-2001 or Wage Order 3-2001, employees must be paid during equipment breakdown if they remain under the employer's control.

Plaintiffs state in their declarations that they were required to stay on Defendant's premises during work stoppages, but the trial court rejected that testimony as lacking in credibility.  As we have said, credibility determinations are within the trial court's purview when ruling on class certification, and we will not disturb the court's credibility determinations on appeal.  Without plaintiffs' testimony, there is no substantial evidence of a company-wide policy requiring employees to stay on company premises and within the company's control during equipment breakdowns.  The trial court did not err in so concluding.

## V.    Meal Breaks

### A.    *Plaintiffs' Evidence*

Plaintiffs' fourth contention is that Overhill employees were permitted only 25-minute meal breaks, rather than the 30-minute meal breaks required by law.  In support of class certification, Isela Hernandez declared as follows:  "I was routinely told and I understood that meal breaks were 25 minutes long.  Therefore I routinely did not

33

receive a thirty minute meal break." Guadalupe Baez similarly declared: "During my employment as a Production Worker, Overhill Farms required me to end my lunch at no later than 25 minutes so I could perform tasks . . . like washing hands and putting on gloves, and be ready to work at the end of 30 minutes. . . . During my employment as a Lead Person, Overhill Farms required me to end my lunch at no later than 25 minutes so I could perform tasks, like, prepare the room, and be ready to work at the end of 30 minutes." Maria Gonzalez, Maria Zulema Sanchez, Anastacio Mendez Trinidad, Maria Magdalena, Juana Vasquez, and Maria Vasquez gave similar declaration testimony.

Plaintiffs also submitted the transcript of the deposition of Isela Hernandez. Hernandez testified that "[w]e had to come in five minutes prior to the half hour so we could prepare and be ready to start at the line when the half hour was up." When asked whether her timecards would consistently reflect 25-minute lunch breaks, she said as follows:

"A    Not always because, I'll be honest, sometimes I would take more time.

"Q    What do you mean?

"A    As I was not accustomed to punch in and out for lunch, then I would forget that I had to clock — to clock back in.

"Q    So sometimes you actually took 30 minutes or more for lunch and other times you came back early?

"A    In actuality, it was not that much more, but maybe two minutes or sometimes right at the half.

"Q    Okay. So sometimes you took a full 30 minutes for your meal break?

"A    (Witness nods head.)

"Q    Yes?

"A    Not eating. Sometimes I had to use the facilities, or what have you, but, yes, I would clock —

"Q    Yeah, sometimes you took a full 30 minutes not working during your break?

"A    Yes.

"Q      And sometimes you took even maybe a minute or two longer than 30 minutes for your meal break?

"A      Maybe.

"Q      And then sometimes you took less than 30 minutes for your meal break?

"A      Yes.

"Q      And so why was there that difference?  Why was there sometimes you took more and sometimes you took a little less?

"A      I already explained that sometimes I would forget that I had to clock in or out.

"Q      Did anybody ever criticize you for doing that, for forgetting to clock back in?

"A      I would communicate that to my supervisor and he would scold me, reprimand me.

"Q      Did anybody ever criticize you for taking 30 minutes between swipes for meal breaks?

"A      No, I don't recall.

"Q      Did you ever get any written counseling, a warning, for having taken 30 minutes or more for a meal break?

"A      No, not for lunch, not that I can recall.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"Q      Did anybody at the company ever tell you that you had to come back five minutes early from lunch?

"A      Yes.

"Q      Who told you that?

"A      My supervisor.

"Q      Who?

"A      Leva Aveldano.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"Q     And when did Leva tell you that you had to come back five minutes early from lunch?

"A     When I started to work for the company."

B.     *Overhill's Evidence*

In opposition to class certification, Overhill submitted the declaration of Yolanda Diaz, which stated as follows:

"17.     Section XI.A of the CBA guarantees a 'thirty (30)-minute meal period' for all Union employees.  In addition, Overhill's employee handbook provides that '[e]ach employee receives an unpaid thirty (30) or sixty (60) minute break for lunch.'  . . .

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"21.     I have conducted training for supervisors and leads that reminded them of the company's policy regarding meal breaks.  For example, I held several meetings during the weeks of May 17 and 24, 2010, during which I reminded lead employees, supervisors, and other management that the company's policy, and requirement under the CBA, was to provide all employees with a full 30 minutes for lunch, which would not include time spent handwashing and changing clothes."

Overhill also submitted the declaration of Jose Menendez, which stated as follows: "When I was the [Quality Control (QC)] supervisor, I advised the QC employees that they were entitled to a 30-minute lunch period each day.  The ability to take this break was well known to the QC employees. . . .  QC employees were not assigned a particular time during their shift to take a meal period.  Rather, their flexible duties throughout the day permitted plenty of opportunities to take a lunch break.  The technicians were simply instructed to take a meal break between their fourth and fifth hours of work.  The QC employees kept track of their own time spent on lunch, and they decided for themselves when to come back from break.  I never told an employee when to return to work following a meal break.  As far as I knew, QC employees washed their hands and put their smock back on only after taking a full 30 minute meal period.  In fact, I regularly told employees that they could take 31, 32, or 33 minutes for lunch without any problem,

36

but that they were not to take less than 30 minutes.  No employees ever complained to me that they were not able to take a meal break, or that they were not able to take a full 30 minutes for lunch."

Overhill also submitted the declarations of several hourly employees, all of whom said they consistently received 30-minute meal breaks.  The declaration of Teodoro Garcia is illustrative:  "I have always received a full thirty minute meal period in about the middle of my shift.  I clock in and out for my lunch break.  As a lead person, I tell the line employees when it is lunch time.  When we go to break, we take off our gloves and throw them away and take off our smocks and hang them on a hook in the assembly room.  This takes only about 30 seconds or so.  Though the company truly gives us more than the 30 minutes for lunch.  [¶]  . . .  [¶]  . . . I generally keep track of my own time on the lunch break.  I clock out and in for lunch.  After 30 minutes, I clock in.  Then I return to the assembly room, wash my hands, put on my smock, and put on a new pair of vinyl gloves. . . .  [¶]  . . . I have always received my full 30 minute lunch break."  Dolores Martinez, Beatriz Martinez, Julieta Perez, and Nestora Cabada gave similar declaration testimony.

Finally, John Cafarella, Overhill's information technology consultant, submitted a declaration that stated as follows:  "I ran a query regarding all Quality Control [(QC)] employees' lunch activity, which showed that the average time that QC employees clocked out for lunch was 28.72 minutes per day.  By contrast, the average time that employees in other departments clocked out for lunch varied; for example: (i) Preparation — 31.7 minutes per day; (ii) Assembly — 33.7 minutes; (iii) Packing — 32.9 minutes; and (iv) Sanitation — 27.3 minutes."

### C.　　Trial Court's Findings

"As noted above, the class members' declarations are not very convincing. Despite having worked for Defendant for many years, none of the class members state who told them they had to stop their meal break after 25 minutes.  Indeed, Plaintiff Hernandez testified that she took meal breaks of varying lengths without criticism; some

meal breaks were longer than 30 minutes, some meal breaks were shorter than 30 minutes and some meal breaks were exactly 30 minutes.  Therefore, Plaintiffs have not provided substantial evidence of a classwide policy requiring class members to take 25 minute meal breaks."  (Internal record reference omitted.)

### D. *Analysis*

The evidence concerning the permitted length of employee meal breaks is contradictory—plaintiffs' witnesses uniformly declare that they were permitted only 25 minutes for meal breaks, while Overhill's witnesses uniformly say they received at least 30 minutes for meal breaks.  As we have said, if the parties' evidence conflicts, the trial court is permitted to credit one party's evidence over the other's in determining whether the requirements for class certification have been met.  (*Dailey*, *supra*, 214 Cal.App.4th at p. 991.)  In determining the record did not support class certification, the trial court explicitly credited Overhill's evidence, finding that plaintiffs' declarations "are not very convincing."  The trial court acted within its discretion in making this credibility determination, which we necessarily accept on appeal.  (*Ibid*.)  In light of this finding, we hold that the trial court reasonably concluded that the plaintiffs' theory of recovery was not susceptible of common proof.  (See *Mora*, *supra*, 194 Cal.App.4th at p. 509.)

## DISPOSITION

The order denying class certification is affirmed. Defendant is awarded its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

SUZUKAWA, J.

We concur:

EPSTEIN, P. J.

WILLHITE, J.